**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Attorneys for Plaintiff*

[Additional Counsel Appear on Signature Page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUSAN YANG, Individually and on Behalf of All Others Similarly Situated, | Civil Action No.: _____ |
| *Plaintiff*, | **COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| v. | |
| VALEANT PHARMACEUTICALS INTERNATIONAL, INC., J. MICHAEL PEARSON, HOWARD B. SCHILLER, and ROBERT L. ROSIELLO, | **CLASS ACTION** |
| | **DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

Plaintiff Jusan Yang ("Plaintiff"), by his undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls, announcements, and United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company"); analysts' reports and advisories about the Company; and information readily

obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Valeant stock between February 23, 2015 and October 20, 2015, inclusive (the "Class Period"), against Valeant and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").  These claims are asserted against Valeant and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and SEC filings.

2.      Valeant is a specialty pharmaceutical and medical device company that develops, manufactures, and markets a range of branded, generic, and branded generic pharmaceuticals, over-the-counter products, and medical devices, such as contact lenses, intraocular lenses, ophthalmic surgical equipment, and aesthetics devices.  Valeant utilizes two operating and reportable segments: (a) Developed Markets; and (b) Emerging Markets.

3.      The Company states that its strategy is to focus on "core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our lower selling, general and administrative cost model and decentralized operating structure." It also states that a "critical element" of its strategy is "business development" through acquisitions.

4.      In that regard, Valeant is a serial acquirer, using an advantageous tax structure to make purchases and then slashing research and development costs to boost profits.  Within the past five years, Valeant completed more than $30 billon in deals, including the purchase of Bausch & Lomb Inc. in 2013 and the purchase of Salix Pharmaceuticals, Ltd. ("Salix") in 2015.

5.      In large measure, the Company's tactics worked.  Revenues skyrocketed along

2

with the Company's stock price, which climbed from $173.26 on February 20, 2015 – just before the start of the Class Period – to $262.52 on August 5, 2015, an increase of more than 50%.

6.       But questions surrounding the Company's business practices began flooding the market in late September 2015.  For example, on September 28, 2015, the Company issued a press release announcing that it had distributed a letter to its employees relating to recent changes in the price of Valeant stock to address concern that Valeant's "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug price reimbursement." That same day, it was reported by *Bloomberg* that "[a]ll Democratic members of House Oversight and Government Reform [Committee] sent a letter to Chairman Jason Chaffetz urging him to subpoena Valeant Pharmaceuticals documents related to 'massive price increases' for two drugs used to treat heart conditions," according to an e-mailed statement.

7.       In the September 28, 2015 Congressional Committee letter, U.S. Representatives wrote, in part:

> [I]n February, Valeant purchased the rights to sell Nitropress, which is used to treat congestive heart failure and hypertensive episodes, and Isuprel, which is used to treat heart block and abnormal heart rhythm.  The same day, Valeant increased the prices of these drugs to $805.61 and $1,346.62, respectively (increases of 212% and 525%).  When asked about its price increases, a Valeant spokeswoman responded: "Our duty is to our shareholders and to maximize the value" of the drugs.

8.       The letter also revealed that on July 31, 2015, staff members from the House Oversight Committee had a joint call with representatives from Valeant, but that they "failed to adequately answer our questions about the basis for their skyrocketing prices." It also stated that on August 12, 2015, "Ranking Member Cummings sent the document request to Valeant" and that on September 3, 2015, "Valeant rejected Ranking Member Cummings' request in a

dismissive two-page letter that refused to provide any of the requested documents."

9.      After closing at $199.47 on September 25, 2015, the price of Valeant

stock dropped $32.97 per share, or more than 16%, to close at $166.50 per share on September 28,

2015.  The stock continued its decline on September 29, 2015, falling an additional $8.42, or 5%, to

close at $158.08 as media outlets reported that Valeant was "in [the] crosshairs of U.S. Congress" for

its practice of "engaging in a business strategy of buying old neglected drugs and turning them into

high-price specialty drugs."

10.      On October 5, 2015, as U.S. stocks saw broad increases, shares of Valeant

dropped again, falling by $18.86, or more than 10%, to close at $163.46 as a result of, as Jim

Cramer stated on CNBC's "Mad Dash" segment, "a continued overhang thanks to the U.S.

Congress and its investigation into rising drug prices, specifically Valeant's drugs." On that day,

*The New York Times*, in an article titled "A Drug Company's Price Tactics Pinch Insurers and

Consumers," reported in depth on Valeant, further detailing the skyrocketing costs of the

Company's drugs, including their impact on Medicare and patients.  Among other things, the

article described how in 2015 alone, "Valeant raised prices on its brand-name drugs an average

of 66 percent. . . about five times as much as its closest industry peers." The article stated that

"Valeant is known for buying companies and laying off their employees to achieve savings" and

that it "spends an amount equivalent to only 3 percent of its sales on research and development"

compared to "[t]raditional big drug companies [that] spend 15 to 20 percent of sales on research

and development." The article shed specific light on how Valeant's egregious drug price

increases were negatively impacting hospitals:

>        Jeffrey M. Rosner, the senior director for pharmacy sourcing and
> purchasing at the Cleveland Clinic, said that nine drugs with particularly
> egregious price increases had cost the hospital an additional $11.2 million
> annually, an increase of about 10 percent in drug costs for hospitalized

patients.  And Valeant's products represented 80 percent of that additional cost, he said.

The price of one Valeant drug, Mephyton, which helps blood clot better, has been increased eight times since July 2014, he said, and now costs about $58.76 a tablet, up from $9.37.  The price of another, Edecrin, a diuretic, has gone up nine times since May 2014 and is now at $4,600 a vial, up from about $470.  When his staff called to inquire, Valeant refused to discuss pricing over the phone, Mr. Rosner said.

11.     The October 5, 2015 *New York Times* article also called into question Valeant's Chief Executive Officer ("CEO") J. Michael Pearson's ("Pearson") September 28, 2015 letter to Company employees, which argued that increased prices accounted for only a small and declining part of the Company's business, stating, "Valeant is well positioned for strong organic growth, even assuming little to no price increases." But, as the October 5, 2015 article pointed out, the Company's second quarter 2015 financial results filed on Form 10-Q with the SEC stated that Valeant's growth in the United States and other developed markets "was driven primarily by price," not by increased volume.

12.     Then, after the market closed on October 14, 2015, Valeant issued a press release revealing that it "recently received" subpoenas from both the U.S. Attorney's Office for the District of Massachusetts and the U.S. Attorney's Office for the Southern District of New York.  The Company stated that "most of the materials requested by the subpoenas relate to documents with respect to our patient assistance programs, and also include requests relating to financial support provided by the company for patients, distribution of the company's products, information provided to the Centers for Medicare and Medicaid Services, and pricing decisions."

13.     On October 15, 2015, the price of Valeant stock dropped by $8.42 per share, or 4.75%, to close at $168.87 on unusually high trading volume of more than 10 million shares.  That day, *Bloomberg* reported that U.S. Senator Claire McCaskill wrote in an emailed statement that "[i]t

appears obvious to me that Valeant has been anything but responsive or transparent – it refused to take any action until served with federal subpoenas, and is still refusing to provide answers to many of the questions I've asked."

14.     On October 19, 2015, the Company reported its third quarter 2015 financial results and hosted an earnings conference call.  Although the Company raised its fourth quarter and full year 2015 revenue and earnings per share ("EPS") guidance, the price of Valeant stock crumbled an additional 7.7% that day as the Company announced a shift to its business model and questions swirled regarding a previously unknown connection between the Company and a specialty pharmacy called Philidor Rx Services, LLC ("Philidor").

15.     Specifically, the Company stated that it may spin-off its line of drugs for which it had pushed through significant price increases that had drawn regulatory scrutiny, and that the Company would focus less on acquisitions that depend on buying old treatments and raising their prices.  To that end, Pearson discussed "seriously considering spinning off or selling" the "Neuro and Other portfolio, which is dependent on price" and that "internal R&D will become more of a focus."

16.     In a slide deck accompanying the earnings conference call, Valeant included a list of anticipated "Questions from Investors." One of the "anticipated" questions – despite the fact that Valeant had not previously discussed Philidor in its SEC filings – was "How does Valeant work with specialty pharmacies and what is Valeant's relationship with Philidor?" In the presentation, Valeant stated, in part:

- We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages

- Similar to many pharmaceutical companies in the U.S., an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies

- We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients

- In almost all cases, our inventory with specialty pharmacies and the title for our medicines only transfer to the pharmacy when the actual prescription is filled – this significantly reduces our distribution fees and product returns.  Less than

- 5% of our U.S. channel inventory sits in the specialty pharmacy channel

- Philidor, one of our specialty pharmacy partners, provides prescription services to patients across the country, and provides administrative services for our copay cards and is a dispensary that fills prescriptions. We have a contractual relationship with Philidor and late last year we purchased an option to acquire Philidor

- Based on a VIE (variable interest entity) assessment in accordance with ASC 810, we consolidate the financials of Philidor.  Inventory held at Philidor remains on Valeant's books and is not included in the specialty pharmacy channel inventory

- For many of our dermatology products, many of our specialty pharmacies, including Philidor, dispense Valeant medications before adjudication of the reimbursement may be finalized.  Patients get their medicines more quickly and Valeant takes the risk for non-reimbursement

- We understand that Philidor:

  - Provides services under our programs for commercially insured and cashpaying claims only.  Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs

  - Does not restrict prescriptions it fills to any particular manufacturers (including Valeant).

  - Dispenses generic products as specified in patient's prescription or as requested by patient

17.    During the October 19, 2015 call, Pearson admitted that the Company had previously omitted disclosure of the nature of its relationship with specialty pharmacies, stating:

7

> The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors.

18.     Pearson also stated that "an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies."

19.     The next question addressed on the slide deck involved R&O Pharmacy, LLC ("R&O") and was titled, "Why did Valeant's General Counsel send a letter inquiring about the $69M owed to Valeant by R&O pharmacy?" The Company's slide deck stated that "R&O is one of the specialty pharmacies in our network" and that Valeant "shipped approximately $69 million at WAC" to R&O, representing approximately "$25 million in net revenue to Valeant," and that R&O "sold a substantial amount of Valeant product" but was "improperly holding significant amounts it received from payers." Pearson also said that inventory held by R&O remains on Valeant's financial statements.

20.     As the call continued, Pearson declined to discuss the subpoenas from federal prosecutors, stating, "[w]e will not be answering questions and providing more information that was already covered in the press release on these matters."

21.     Reporting on the newly disclosed relationship between Valeant and certain specialty pharmacies, on October 19, 2015, *The New York Times* published an article entitled, "Drug Makers Sidestep Barriers on Pricing." The article discussed how Valeant uses Philidor to "keep the health system paying for high-priced drugs" and that Valeant uses Philidor to keep prices high for its dermatology products, quoting a Florida dermatologist as stating that Valeant's program is designed to buffer physicians from insurers and complaints from their patients about high prices.  Discussing Philidor, the article stated, in part:

> Philidor, based in Hatboro, Pa., reveals little about itself of its website.  It was denied a license in California in 2004 because, the state said, its

application had not truthfully identified its owners and financial officers. Calls on Monday asking to speak to Philidor executives were not returned.

Valeant had said little about Philidor until Monday, when J. Michael Pearson, Valeant's chief executive, revealed on his company's quarterly earnings call that Valeant had purchased an option to acquire Philidor late last year.  He said that Valeant consolidated Philidor's results in its own financial reports.

Specialty pharmacies are most known for providing patients with assistance with complex drugs, many of them requiring refrigeration and injections, for diseases like cancer, multiple sclerosis and rare genetic disorders.  But the drugs dispensed through the specialty pharmacies used by. . . Valeant are for common ailments like arthritis pain, acne, and toenail fungus.

22.     Then, on October 21, 2015, Citron Research published a report entitled, "Valeant: Could this be the Pharmaceutical Enron?" Among other things, the report questioned why Valeant "a major big cap pharma, a darling of the hedge fund crowd, a suitor of Allergan and an aggressive acquirer of pharmas like Salix, Bausch & Lomb, etc., etc.," would "be secretly maneuvering to buy a little known pharmacy with a dubious ownership structure" and questioned "[w]hy was this entity NEVER disclosed in any prior company disclosure?"

23.     Continuing, the Citron report charged that Valeant is using a network of specialty mail-order pharmacies that Valeant actually controls to prop up sales of its high-priced drugs and to keep patients and their insurance companies from switching to less costly generics.  In addition, the Citron report brought to light a recently issued investigative report from Southern Investigative Reporting Foundation that questioned the nature of Valeant's relationship with specialty pharmacies.  Citron's report asserts that Philidor and another specialty pharmacy tied to Valeant, R&O, are actually the same company with the same management.  The Citron report included images of documents from both the R&O and Philidor websites indicating that the two companies were interrelated, including overlapping privacy notices, identical toll-free numbers to reach their privacy officer, and a facsimile number from the R&O website that linked to Philidor.

The report continued:

>And as if this isn't enough, it appears to Citron that Valeant/Philidor have created an entire network of phantom captive pharmacies. . . the same privacy notice appears on several other "ghost ship" putative pharmacy websites.
>
>http://westwilshirepharma.com/downloads/ww_npp.pdf
>
>http://saferxpharma.com/downloads/saferx_npp.pdf
>
>http://orbitpharmacy.com/downloads/orbit_npp.pdf
>
>Oh, and as by mere coincidence, these all have the same Privacy Officer contact phone number: (855) 815-7688.  And these domains were all registered on the same day!

24.     Ultimately, the Citron report posited that Valeant was using a secretive relationship with Philidor to store inventory and record those transactions as sales, and that the Company uses phantom accounts to fool auditors and investors.  Summarizing the Citron report, *Bloomberg* reported that Valeant shares "took a beating, falling by more than 30 percent [intra-day], after a stock-commentary site run by a short seller accused the company of an Enron-like strategy of recording fake sales by using phony customers."

25.     Among other things, the Citron report also shed additional light on issues between R&O and Valeant.  Expanding on the mention of R&O during the Company's October 19, 2015 earnings call, the Citron report described a lawsuit filed in the United States District Court for the Central District of California in which R&O sued Valeant and alleged it had gotten a letter from Valeant's general counsel on September 4, 2015 indicating that R&O owed Valeant more than $69 million.  R&O, however, stated it never received a previous invoice from Valeant for any amount and that either Valeant and R&O are "victims of a massive fraud perpetuated by third parties" or that "Valeant is conspiring with other persons or entities to perpetuate a massive fraud against R&O and others." Commenting on the lawsuit, Citron stated it was evidence that Valeant is

10

creating invoices "to deceive the auditors and book revenue" and that "Valeant/Philidor have created an entire network of phantom captive pharmacies" to create fake sales of drugs or to avoid scrutiny from auditors.

26.     The market reacted swiftly to the disclosures in the Citron report.  On October 21, 2015, trading in Valeant shares was halted on a circuit breaker because of the rapid price decline after Citron published its report on its website.  When trading resumed, Valeant shares fell nearly 40%, at which point trading was again suspended.  After swooning down nearly $60 a share in intra-day trading, Valeant shares closed down approximately 19%, or $28.42 per share, on highly abnormal trading volume of more than 88 million shares, paring losses as the Company issued a denial of the charges in the Citron report.[1]

27.     The following day, the price of Valeant shares dropped again after an analyst who had advised buying the stock for more than two years downgraded the shares, citing questions about Valeant's close ties to specialty pharmacies that distribute its drugs.  BMO Capital Markets ("BMO") stated it "cannot defend the specialty structure" and downgraded the shares to "market perform." Continuing, BMO's report stated, "We've been strong, vocal Valeant bulls" but that "we find Valeant's arrangements with specialty pharmacy Philidor as not just aggressive, but questionable."

**JURISDICTION AND VENUE**

28.     Jurisdiction is conferred by Section 27 of the 1934 Act, 15 U.S.C. §78aa.  The claims asserted herein arise under Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

---

[1] After the market closed on October 21, 2015, Philidor issued a press release disclosing that it did indeed have a contractual relationship with "affiliated pharmacies," including R&O, and stating that Philidor "does not currently have a direct equity ownership in R&O Pharmacy or the affiliated pharmacies, but does have a contractual right to acquire the pharmacies now or in the future subject to regulatory approval."

549573.1

29.     Venue is proper in this District pursuant to Section 27 of the 1934 Act.  The violations of law complained of herein occurred in part in this District, including the dissemination of materially false and misleading statements complained of herein into this District.  Valeant's United States headquarters are located in this District at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey 08807.

30.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.  Valeant trades in an efficient market on the New York Stock Exchange ("NYSE").

## PARTIES

31.     Plaintiff purchased Valeant stock as described in the attached certification and suffered damages as a result of the securities fraud alleged herein.

32.     Defendant Valeant Pharmaceuticals International, Inc. is incorporated in British Columbia, Canada and has its United States headquarters in this District.  Shares of Valeant stock trade on the NYSE under the ticker symbol "VRX."

33.     Defendant J. Michael Pearson is and at all relevant times was CEO and Chairman of Valeant's board of directors.

34.     Defendant Howard B. Schiller ("Schiller") was an Executive Vice President and the Chief Financial Officer ("CFO") of the Company until June 30, 2015, when he resigned those positions.  Schiller is a member of the Company's board of directors and a consultant to the Company.

35.     Defendant Robert L. Rosiello ("Rosiello") has been the Company's CFO since July 2015 and is also an Executive Vice President of the Company.

12

36.     Defendants Pearson, Schiller, and Rosiello (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Valeant's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

37.     Defendants are liable for: (a) making false statements; or (b) failing to disclose adverse facts known to them about Valeant.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Valeant stock was a success, as it: (a) deceived the investing public regarding Valeant's prospects and business; (b) artificially inflated the price of Valeant common stock; and (c) caused Plaintiff and other members of the Class, as defined below, to purchase Valeant stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Valeant stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families; the

549573.1

officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Valeant trades on the NYSE and has more than 341 million shares outstanding, owned by hundreds, if not thousands, of persons.

40.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether Defendants violated the 1934 Act;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the price of Valeant stock was artificially inflated; and

(f)     the extent of damages sustained by Class members and the appropriate measure of damages.

41.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

42.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

14

with those of the Class.

43.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

44.     On February 22, 2015, the Company issued a press release reporting its fourth

quarter and full year 2014 financial results, and stated that full year 2015 guidance reflecting

recent acquisitions, "as well as expected business outperformance" would be "updated on first

quarter 2015 earnings call." The press release quoted Pearson as stating:

> *Valeant's relentless focus on building diversified, durable businesses with strong organic growth platforms, coupled with disciplined business development, is paying off for all of our stakeholders*.
>
> *Outstanding growth in the U.S.*, most notably dermatology, offset the negative impact from foreign exchange.  In addition, we continued to see strong organic growth in several emerging markets such as China, the Middle East and Russia.  *With our strong finish to the year, we are well positioned for another year of outperformance in 2015*.

45.     Also on February 22, 2015, the Company announced that it agreed to buy Salix

for $158 per share, or approximately $14.5 billion, to add gastrointestinal drugs to Valeant's line

of products.

46.     On February 25, 2015, the Company filed with the SEC its annual report on Form 10-

K for the year ended December 31, 2014.  The report was signed by Pearson and Schiller, and

contained Sarbanes-Oxley ("SOX") certifications signed by each of them stating that the annual

report did not contain any untrue statements or omissions of material facts.  The 2014 annual report

repeated the financial results found in the February 22, 2015 press release, and also stated, in part:

> *Our strategy is to focus our business on core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our lower selling, general and administrative cost model and decentralized*

*operating structure*.  We have an established portfolio of durable products with a focus in the eye health and dermatology therapeutic areas.  We believe these products have the potential for strong operating margins and solid growth and are particularly attractive for a number of reasons including:

- They are largely cash pay, or are reimbursed through private insurance, and, as a result, are less dependent on increasing government reimbursement pressures than other products;

- They tend to have established brand names and do not rely primarily on patent or regulatory exclusivity;

- They tend to have the potential for line extensions and life-cycle management programs; and

- They tend to be smaller on an individual basis, and therefore typically not the focus of larger pharmaceutical companies.

*Another critical element of our strategy is business development*.  We have completed numerous transactions over the past few years to expand our portfolio offering and geographic footprint, including, among others, the acquisitions of Bausch & Lomb Holdings Incorporated ("B&L") and Medicis Pharmaceutical Corporation ("Medicis").  We will continue to pursue value-added business development opportunities as they arise.

*The growth of our business is further augmented through our lower risk, output-focused research and development model*.  This model allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.  This is achieved primarily by:

- focusing on innovation through our internal research and development, acquisitions, and in-licensing;

- focusing on productivity through measures such as leveraging industry overcapacity and outsourcing commodity services;

- focusing on critical skills and capabilities needed to bring new technologies to the market;

- pursuing life-cycle management programs for currently marketed products to increase such products' value during their commercial lives; and

16

- acquiring dossiers and registrations for branded generic products, which require limited manufacturing start-up and development activities.

47.     On March 16, 2015, the Company issued a press release announcing that Valeant and Salix agreed on amended terms to the merger agreement, and that Valeant increased the offer price to acquire all the outstanding common stock of Salix from $158.00 per share to $173.00 per share in cash, for a total value of approximately $15.8 billion.

48.     On March 17, 2015, the Company issued a press release announcing that it would issue 7,286,432 shares at a price of $199.00 per share in its $1.45 billion offering of common shares in connection with the Salix acquisition.

49.     On March 18, 2015, the Company filed its Prospectus Supplement and Registration Statement for its offering of $1.45 billion of common shares of Valeant in connection with the tender offer for Salix in connection with the merger.  The Prospectus stated that shares would be offered at $199 per share for total proceeds of $1,449,999,968.  The Prospectus Supplement stated, in relevant part:

> *Our strategy is to focus our business on core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our low selling, general and administrative ("SG&A") cost structure and decentralized operating model to ensure decisions are made close to the customer.*
>
> \*        \*        \*
>
> *The growth of our business is further augmented through our lower-risk, output-focused research and development model, which allows us to advance certain development programs to drive future revenue growth, while minimizing our research and development expense.*  This is achieved primarily by:
>
> - sourcing innovation through our internal research and development, as well as through acquisitions and in-licensing;
>
> - focusing on productivity in order to minimize costs through measures such as leveraging industry overcapacity and outsourcing commodity services;

17

- focusing on critical skills and capabilities needed to bring new technologies to the market;

- pursuing life-cycle management programs for currently marketed products to increase such products' value during their commercial lives; and

- acquiring dossiers and registrations for branded generic products, which require limited manufacturing start-up and development activities.

50.     Discussing the sale of inventory, the Prospectus Supplement stated, in part:

Even after the inventory held by wholesalers has reached desired levels, wholesalers will make estimates to determine end-user prescription demand, and may not be completely effective in matching their inventory levels to actual end-user prescription demand.  In addition to wholesalers, *inventory is held at retail pharmacies and other non-wholesale locations over whose buying patterns we will have limited influence*.  Adverse changes in economic conditions and other factors may cause retail pharmacies to reduce their inventories of the combined company's GI products, which would reduce their orders from wholesalers and, consequently, the wholesalers' orders from the combined company, even if end-user prescription demand has not changed.  As a result, changes to inventory levels held by wholesalers may cause the combined company's operating results to fluctuate unexpectedly if the combined company's sales to wholesalers do not match end-user prescription demand.

51.     On April 1, 2015, the Company issued a press release announcing the consummation of its merger with Salix.

52.     On April 29, 2015, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2015, as well as increased guidance for full year 2015.  The press release stated, in relevant part:

2015 First Quarter Results

- Total Revenue $2.2 billion; an increase of 16% over the prior year despite negative foreign exchange impact of $140 million

- Excluding negative impact of foreign exchange and last year's divestiture of the aesthetics injectable business, revenue increased 27% over the prior year

*       *       *

- GAAP EPS $0.21; Cash EPS $2.36, an increase of 34% despite negative foreign exchange impact of $0.12 over the prior year

- Excluding negative impact of foreign exchange and last year's divestiture of the aesthetics injectable business, Cash EPS increased 50% over the prior year

*       *       *

2015 Guidance

- Increasing Total Revenue to $10.4 - $10.6 billion up from $9.2 - $9.3 billion

- Expect Salix Revenue of ~$1.0 billion in 2015

  - Reflects implementation of wholesaler inventory reduction program; plan to reduce Salix wholesaler inventory levels to approximately 1.5 months by year-end

- Increasing Cash EPS to $10.90 - $11.20 per share up from $10.10 - $10.40

- Expect Same Store Sales Organic Growth of >10% for the second through fourth quarters of 2015

53.    The April 29, 2015 earnings press release quoted Pearson as stating, "***Our first quarter results demonstrate the strong performance of our diversified business model as we exceeded our first quarter guidance*** despite losing $140 million in revenue and $0.12 in Cash EPS to foreign exchange headwinds.  The Company delivered exceptional double digit organic growth for the third quarter in a row, driven by the strength of most of our business units around the world."

54.    Also on April 29, 2015, the Company issued a press release announcing that Schiller would be stepping down as CFO upon appointment of a successor.  On June 11, 2015, the Company issued a press release announcing that Rosiello was appointed Executive Vice President and would

take over the role of CFO from Schiller on July 1, 2015.  On July 14, 2015, the Company announced

it entered into a separation agreement with Schiller, effective as of June 30, 2015, regarding his

positions as Executive Vice President and CFO of the Company.  The press release stated that

Schiller would continue to serve as a member of the board of directors and as a consultant to the

Company.

55.     On April 30, 2015, the Company filed its quarterly report on Form 10-Q with the

SEC for the period ended June 30, 2015.  The 10-Q was signed by Pearson and Schiller and

contained SOX certifications signed by each of them stating that the report did not contain any untrue

statements or omissions of material facts.  The Form 10-Q repeated the financial results announced in

the April 29, 2015 press release and made no mention of Philidor or any other specialty pharmacy

affiliated with the Company.  The 10-Q also stated, in part:

> ***Our strategy is to focus our business on core geographies and therapeutic
> classes that offer attractive growth opportunities while maintaining our
> lower selling, general and administrative cost model and decentralized
> operating structure***.  Within our chosen therapeutic classes and geographies,
> we primarily focus on durable products which have the potential for strong
> operating margins and sustainable organic growth.   Further, we have
> completed numerous transactions over the past few years to expand our
> portfolio offering and geographic footprint, including, among others, the
> Salix Acquisition and the acquisition of Bausch & Lomb Holdings
> Incorporated ("B&L") in August 2013, and we will continue to pursue
> value-added business development opportunities as they arise.  ***The growth
> of our business is further augmented through our lower risk, output-
> focused research and development model, which allows us to advance
> certain development programs to drive future commercial growth, while
> minimizing our research and development expense***.  We believe this
> strategy will allow us to maximize both the growth rate and profitability of
> the Company and to enhance shareholder value.

56.     On July 23, 2015, the Company issued a press release announcing its second

quarter 2015 financial results and increasing the Company's full year 2015 guidance.  The press

release reported, in relevant part:

549573.1

2015 Second Quarter Results

- Total Revenue $2.7 billion; an increase of 34% over the prior year

  - Excluding negative impact of foreign exchange ($173 million) and the contribution of Salix ($313 million), revenue increased 27% over the prior year

- GAAP EPS Loss of $0.15; Cash EPS $2.56

  - Excluding negative impact of foreign exchange ($0.13) and the negative contribution of Salix ($0.04) , Cash EPS would have been $2.73, a growth rate of 43%

\*        \*        \*

Full Year 2015 Guidance Update

- Increasing 2015 Total Revenue to $10.7 - $11.1 billion up from $10.4 - $10.6 billion

  - Salix revenue expected to be ~$1.2 billion

- Increasing 2015 Cash EPS to $11.50 - $11.80 per share up from $10.90 - $11.20 to reflect continued business outperformance and approval of IBS-D indication for Xifaxan

- Increasing Adjusted Cash Flow from Operations to greater than $3.2 billion, up from greater than $3.1 billion

- Expect Same Store Sales Organic Growth of >10% for second half of 2015

57.     The July 23, 2015 press release also quoted Pearson as stating:

We once again exceeded our guidance and delivered our fourth consecutive quarter of greater than 15% organic growth. ***Our strong second quarter results were driven by outperformance in our U.S. businesses***, strong results in certain emerging markets and outstanding starts to both the Salix and Dendreon acquisitions.  In addition, we have signed eight new transactions so far this year and have realized several significant R&D milestones, including the approval of Xifaxan for IBS-D and the NDA submissions for Vesneo and Relistor Oral.  ***As a result, we feel confident in raising our guidance for the remainder of 2015***.

58.     On July 27, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2015.  The 10-Q was signed by Pearson and Rosiello and contained SOX certifications signed by each of them stating that the report did not contain any untrue statements or omissions of material facts.  The Form 10-Q repeated the financial results announced in the July 23, 2015 press release and made no mention of Philidor or any other specialty pharmacy affiliated with the Company.  The 10-Q also stated, in part:

> Our strategy is to focus our business on core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our lower selling, general and administrative cost model and decentralized operating structure.  Within our chosen therapeutic classes and geographies, we primarily focus on durable products which have the potential for strong operating margins and sustainable organic growth.  Further, we have completed numerous transactions over the past few years to expand our portfolio offering and geographic footprint, including, among others, the Salix Acquisition and the acquisition of Bausch & Lomb Holdings Incorporated ("B&L") in August 2013 (the "B&L Acquisition"), and we will continue to pursue value-added business development opportunities as they arise.  The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.  We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.
>
> *          *          *
>
> In connection with our acquisitions, we have implemented cost-rationalization and integration initiatives to capture operating synergies and generate cost savings across the Company.  These measures included:
>
> - workforce reductions across the Company and other organizational changes;
>
> - ***closing of duplicative facilities and other site rationalization actions company-wide, including research and development facilities***, sales offices and corporate facilities;
>
> - ***leveraging research and development spend***; and/or

22

- procurement savings

*       *       *

As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. Provision balances relating to estimated amounts payable to direct customers are netted against accounts receivable, and balances relating to indirect customers are included in accrued liabilities. . . . ***Provisions as a percentage of gross sales increased to 32% and 33% for the second quarter and first half of 2015, respectively, compared with 27% and 26% in the second quarter and first half of 2014. The increase was driven by (i) higher provisions for rebates, chargebacks, and returns, including managed care rebates for Jublia® and the co-pay assistance programs for launch products including Jublia®, Onexton®, and Retin-A Micro® Microsphere 0.08% ("RAM 0.08%") and (ii) higher rebate percentages for sales to the U.S. government (including Wellbutrin XL®) partially offset by (iii) lower provisions (mainly rebates) associated with products acquired in the Salix Acquisition in the second quarter of 2015***.

59.    On September 28, 2015, the Company filed a Form 8-K with the SEC that attached a letter from the Company (signed by Pearson) to its employees "relating to recent changes in Valeant's stock price."

60.    On October 5, 2015, the Company filed a Form 8-K with the SEC purporting to correct inaccuracies about the Company that were being reported in the media.

61.    On October 19, 2015, the Company issued a press release reporting its third quarter 2015 financial results.  The press release reports "[t]otal [r]evenues of $2.8 billion; an increase of 36% over the prior year despite negative foreign exchange impact of $172 million" along with "GAAP EPS $0.14; Cash EPS $2.74, an increase of 30% over prior year despite the negative foreign exchange impact of $0.13 versus the prior year." The press release also announced increased fourth quarter 2015 guidance, with total revenue increased to $3.25-$3.45 billion from

23

$3.2-$3.4 billion and EPS increased to $4.00-$4.20 from $3.98-$4.18.  The Company also raised its full year 2015 guidance, with total revenue increased to $11.0-$11.2 billion from $10.7-$11.1 billion and EPS increased to $11.67-$11.87 from $11.50-$11.80.  The October 19, 2015 press release quoted Pearson as stating:

> Today, we reported yet another consecutive quarter of strong financial results that exceeded expectations.  I am incredibly proud of the hard work and effort put forth by Valeant's employees around the world.  I would also like to thank all the doctors who prescribe our products and the patients who use them.  We will be discussing our outperformance on our conference call later today, as well as addressing the most frequently asked questions we have been hearing from our shareholders.  With our strong product portfolio and growth prospects, we feel very confident in our future outlook and we are reaffirming our $7.5 billion EBITDA floor for 2016.

62.     As set forth above, the Company hosted an earnings call on October 19, 2015 that, for the first time, shed light on the previously undisclosed and direct relationship between Valeant and certain specialty pharmacies.  Also on October 19, 2015, *The New York Times* published the above-mentioned articled entitled "Drug Makers Sidestep Barriers on Pricing."

63.     On October 21, 2015, Citron published its scathing report asserting that Valeant was akin to "Enron part deux" and that the Company's practices had "the distinct aroma of product being jammed into a channel."

64.     The true facts, which were known by Defendants but concealed from the investing public during the Class Period, were as follows:

(a)     Defendants' Class Period statements omitted disclosure of key aspects of the Company's business, specifically the Company's relationship with a network of specialty pharmacies utilized to boost sales of the Company's high-priced drugs;

(b)     Valeant's undisclosed use of specialty pharmacies as set forth herein left it subject to increased regulatory risks that investors were unable to account for;

(c)     Without use of specialty pharmacies, Valeant's financial performance would have been negatively impacted;

(d)     Without use of specialty pharmacies, Valeant's Class Period financial guidance would have been negatively impacted; and

(e)     As a result of the foregoing, Defendants' statements regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.

65.     As a result of Defendants' false statements and omissions, Valeant stock traded at artificially inflated prices during the Class Period.  After the above revelations were revealed to the market, however, the price of Valeant stock declined significantly as the artificial inflation was removed.

## ADDITIONAL SCIENTER ALLEGATIONS

66.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Valeant, their control over and/or receipt and/or modification of allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Valeant, participated in the fraudulent scheme alleged herein.

549573.1

## LOSS CAUSATION/ECONOMIC LOSS

67.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Valeant stock and operated as a fraud or deceit on Class Period purchasers of Valeant stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market through a partial disclosure, the price of Valeant stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Valeant stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth about Valeant was revealed through the several disclosures specified herein, which removed the artificial inflation from the price of Valeant common stock.

68.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Valeant's business and prospects.  Defendants' false and misleading statements had the intended effect and caused Valeant stock to trade at artificially inflated levels throughout the Class Period.

69.     As a direct result of the disclosures identified herein, the price of Valeant stock fell precipitously.  This removed the artificial inflation from the price of Valeant stock, causing real economic loss to investors who had purchased Valeant stock at artificially inflated prices during the Class Period.

70.     The price declines were a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market through several partial disclosures. The timing and magnitude of the price declines in Valeant stock negate any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market

26

conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Valeant stock and the subsequent significant decline in the value of Valeant stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

71.     At all relevant times, the market for Valeant stock was an efficient market for the following reasons, among others:

(a)     Valeant stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Valeant filed periodic public reports with the SEC;

(c)     Valeant regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Valeant was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

72.     As a result of the foregoing, the market for Valeant stock promptly digested current information regarding Valeant from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Valeant stock during the Class Period suffered similar injury through their purchase of Valeant stock at artificially inflated price and

549573.1

a presumption of reliance applies.

## NO SAFE HARBOR

73.     The "Safe Harbor" warnings accompanying Valeant's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

74.     Defendants are also liable for any false and misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Valeant who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE 1934 ACT AND RULE 10b-5 AGAINST ALL DEFENDANTS

75.     Plaintiff incorporates ¶¶1-74 by reference.

76.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

77.     Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

549573.1

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Valeant stock during the Class Period.

78.     In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, Defendants had a duty to promptly disseminate truthful information with respect to Valeant's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's stock would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

79.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Valeant stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Valeant stock and experienced loses when the artificial inflation was released from Valeant stock as a result of the partial revelations and stock price decline detailed herein. Plaintiff and the Class would not have purchased Valeant stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

80.     By virtue of the foregoing, Valeant and the Individual Defendants have each

violated Section 10b of the 1934 Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE 1934 ACT
### AGAINST ALL DEFENDANTS

81.     Plaintiff incorporates ¶¶1-74 by reference.

82.     The Individual Defendants acted as controlling persons of Valeant within the meaning of Section 20(a) of the 1934 Act.  By reason of their controlling positions with the Company, and their ownership of Valeant common stock, the Individual Defendants had the power and authority to cause Valeant to engage in the wrongful conduct complained of herein. Valeant controlled the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable, injunctive, or other relief as deemed appropriate by the Court.

549573.1

## JURY DEMAND

83.     Plaintiff demands a trial by jury.


Dated:  October 27, 2015                    **LITE DEPALMA GREENBERG, LLC**


                                             _/s/ Bruce D. Greenberg_
                                            Bruce D. Greenberg
                                            570 Broad Street, Suite 1201
                                            Newark, New Jersey 07102
                                            Telephone: (973) 623-3000
                                            Facsimile: (973) 623-0858
                                            bgreenberg@litedepalma.com

                                            **POMERANTZ LLP**
                                            Jeremy A. Lieberman
                                            J. Alexander Hood II
                                            Marc Gorrie
                                            600 Third Avenue, 20th Floor
                                            New York, New York 10016
                                            Telephone:  (212) 661-1100
                                            Facsimile:   (212) 661-8665
                                            jalieberman@pomlaw.com
                                            ahood@pomlaw.com
                                            mgorrie@pomlaw.com

                                            **POMERANTZ LLP**
                                            Patrick V. Dahlstrom
                                            10 South La Salle Street, Suite 3505
                                            Chicago, Illinois 60603
                                            Telephone:  (312) 377-1181
                                            Facsimile:   (312) 377-1184
                                            pdahlstrom@pomlaw.com

                                            _Attorneys for Plaintiff_

549573.1

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is not related to any other action, pending arbitration or administrative proceeding currently pending in any court.

I hereby certify that the following statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated:  October 27, 2015                     **LITE DEPALMA GREENBERG, LLC**


                                             */s/ Bruce D. Greenberg*
                                             Bruce D. Greenberg
                                             570 Broad Street, Suite 1201
                                             Newark, New Jersey 07102
                                             Telephone: (973) 623-3000
                                             Facsimile: (973) 623-0858
                                             bgreenberg@litedepalma.com

                                             **POMERANTZ LLP**
                                             Jeremy A. Lieberman
                                             J. Alexander Hood II
                                             Marc Gorrie
                                             600 Third Avenue, 20th Floor
                                             New York, New York 10016
                                             Telephone:  (212) 661-1100
                                             Facsimile:   (212) 661-8665
                                             jalieberman@pomlaw.com
                                             ahood@pomlaw.com
                                             mgorrie@pomlaw.com

                                             **POMERANTZ LLP**
                                             Patrick V. Dahlstrom
                                             10 South La Salle Street, Suite 3505
                                             Chicago, Illinois 60603
                                             Telephone:  (312) 377-1181
                                             Facsimile:   (312) 377-1184
                                             pdahlstrom@pomlaw.com

                                             *Attorneys for Plaintiff*

549573.1